[Crim. Nos. 6813, 6819. In Bank. Apr. 24, 1961.]

In re JAMES JACK CATHEY on Habeas Corpus.

(Two Cases.)

Louis N. Desmond, under appointment by the Supreme Court, for Petitioner. Additional briefs were filed by Petitioner *pro se.*

Stanley Mosk, Attorney General, Doris H. Maier, Raymond M. Momboisse and C. Michael Gianola, Deputy Attorneys General, for Respondent.

SCHAUER, J.—By applications for habeas corpus petitioner, who is confined in the California Medical Facility at Vacaville, complains of the place and conditions of his detention. The Medical Facility is supervised by the Director

of Corrections and operated under the statutory provisions which apply to "a prison under the jurisdiction of the Department of Corrections . . . insofar as such provisions may be applicable." (Pen. Code, § 6106.) "The primary purpose of the Medical Facility shall be the receiving, segregation, confinement, treatment and care of males under the custody of the Department of Corrections or any agency thereof who are either: 1. Mentally ill, or 2. Mentally defective, or 3. Epileptic, or 4. Addicted to the use of narcotics, or 5. Otherwise physically or mentally abnormal, including but not limited to psychopaths and sex offenders, or 6. Suffering from any chronic disease or condition." (Pen. Code, § 6102.)

Petitioner's principal contention is that because he is not confined under a judgment of conviction of crime, but rather by virtue of a finding of the superior court that he is so insane that he is incapable of understanding the nature of criminal charges pending against him, he should be in the custody of the Department of Mental Hygiene rather than the Department of Corrections. We have concluded that this contention lacks merit and that petitioner has not established grounds for complaint as to the conditions of his confinement.

The manner in which this proceeding came before us is noted in the margin.[1] We appointed counsel for petitioner. After this attorney interviewed petitioner, petitioner wrote to this court that he declined his services "on grounds of lack of confidence and [unspecified] conflicting interests." In view of the fact that petitioner is presently confined pursuant to a finding of the superior court that he is insane, we cannot assent to his attempted refusal to be represented by counsel in this proceeding. (See *People* v. *Kemp* (1961), *ante*, pp. 458, 463-464 [1, 2] [11 Cal.Rptr. 361, 359 P.2d 913].) Although a party who is represented by counsel has no right to be heard personally (*People* v. *Mattson* (1959), 51 Cal.2d 777, 789 [2], 798 [27] [336 P.2d 937]), here petitioner's applications and briefs filed in propria persona during the time before we appointed counsel for him

---

[1] In the case now numbered Crim. 6813, an order to show cause was issued by the District Court of Appeal, Third Appellate District, upon petitioner's application in propria persona. After the decision of that court, which appears in (1960, Cal.App.), 9 Cal.Rptr. 533, we granted a hearing.

Petitioner then filed in this court another application in propria persona (Crim. 6819) which complains of an asserted instance of cruel and unusual punishment that allegedly occurred after the decision of the District Court of Appeal. We issued an order to show cause and ordered that the two proceedings be consolidated.

are properly before us, as are briefs subsequently prepared by petitioner personally but filed on his behalf by his counsel. We consider these *pro se* documents as well as the briefs and oral argument of counsel.

Petitioner's present confinement came about in the following manner: On June 8, 1959, in Los Angeles County, he was charged with murder, assault with a deadly weapon with intent to commit murder, and robbery. After the commencement of the Los Angeles proceeding a doubt arose as to petitioner's then sanity. The court, pursuant to section 1368 of the Penal Code,[2] suspended the prosecution and tried the question of petitioner's sanity. It found petitioner insane and pursuant to section 1370 of the Penal Code[3] committed him to Atascadero State Hospital (an institution under the jurisdiction of the Department of Mental Hygiene) "for care and treatment until the defendant [petitioner] becomes sane" and, in compliance with section 1372[4] of the same code, ordered that "When the defendant becomes sane the Superintendent shall so certify and the Sheriff shall return the defendant to this Court for further proceedings." On March 2, 1960, the hospital superintendent, pursuant to the last mentioned section, certified to the Los Angeles Superior Court that petitioner "is now able to understand the nature of the charges against him and can co-operate rationally in his defense."

On March 15, 1960, before petitioner could be returned to Los Angeles, he attacked five psychiatric technicians at Atascadero State Hospital, killing one and seriously wounding four others. Petitioner was placed in the custody of the

---

[2]Section 1368 provides, "If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial . . .; and, from the time of such order, all proceedings in the criminal prosecution shall be suspended until the question of the sanity of the defendant has been determined. . . ."

[3]Section 1370 provides, "If the jury [or judge] finds the defendant insane, the trial or judgment must be suspended until he becomes sane, and the meantime the court must order that he be in the meantime committed by the sheriff to a state hospital for the care and treatment of the insane, and that upon his becoming sane he be redelivered to the sheriff. . . ."

[4]Section 1372 provides, "If the defendant is received into the state hospital he must be detained there until he becomes sane. When he becomes sane, the superintendent must certify that fact to the sheriff and district attorney of the county. The sheriff must thereupon, without delay, bring the defendant from the state hospital, and place him in proper custody until he is brought to trial or judgment, as the case may be, or is legally discharged."

sheriff of San Luis Obispo County, the county in which the hospital is situated. He was charged with one count of murder and four counts of attempted murder. A doubt arose in the mind of the San Luis Obispo Superior Court as to petitioner's sanity. The prosecution was suspended, the question of his sanity tried, and on June 6, 1960, the court found that petitioner ''is so insane he is not capable of understanding the nature of the charges against him, nor is he capable of conducting his defense . . . in a rational manner and . . . co-operating with his counsel.'' It committed petitioner to Atascadero State Hospital and ordered that the authorities there ''be permitted to arrange for confinement of . . . Cathey at any other State correctional facility that is available to them for this purpose.'' It will be remembered that Penal Code, section 1370 (quoted *ante*, footnote 3), does *not* specify that a defendant in such circumstances shall be committed to the custody of the Director of the Department of Mental Hygiene; rather it provides broadly that ''the court must order that he be . . . committed by the sheriff *to a state hospital* for the care and treatment of the insane, and that upon his becoming sane he be redelivered to the sheriff.'' (Italics added.)

Meanwhile, on May 24, 1960, the Department of Corrections and the Department of Mental Hygiene had entered into an interagency agreement (approved by the Director of Finance on June 2, 1960) pursuant to section 11256 of the Government Code. That section provides that ''Subject to approval of the Director of Finance, state agencies may furnish services, materials or equipment to, or perform work for, other state agencies upon such terms and conditions and for such considerations as they may determine and, subject to such approval, may enter into agreements for such purpose. . . .''

The previously mentioned interagency agreement recites that ''. . . the Department of Mental Hygiene has a limited number of patients committed to the Atascadero State Hospital who require custodial management in excess of that provided by the institutions of that department; and . . . the Department of Corrections has facilities at the California Medical Facility at Vacaville where such patients might be more appropriately confined to insure a greater degree of safety to the public as well as to the patients and staff of the institutions operated by the Department of Mental Hygiene.'' Therefore, the Department of Corrections agrees to accept and provide treatment and confinement at the Cali-

fornia Medical Facility for "not to exceed twenty-five adult male patients" committed to the Department of Mental Hygiene as insane. The agreement further provides:

"The Department of Mental Hygiene agrees that no such patient will be transferred to the California Mental Facility unless such patient is considered by the staff of the Department of Mental Hygiene to be extremely dangerous to others, staff, or inmates, and to represent a serious escape risk, and until the patient has been accepted by the Director of Corrections. . . .

"It is agreed that all persons while confined in the California Medical Facility pursuant to this agreement shall retain their status as patients of the Atascadero State Hospital and shall be subject to the laws pertaining to them as such patients. It is further agreed by the Department of Mental Hygiene that all such patients shall be subject to the general rules of the Director of Corrections and the Superintendent of the California Medical Facility."

The Department of Corrections adopted a rule that "Cases which may be considered for transfer to the California Medical Facility are those committed to the Department of Mental Hygiene under:

"a. Section 1026 of the Penal Code — When a defendant is found to have been insane at the time an offense was committed.

"b. Section 1368 of the Penal Code — When a question of sanity arises prior to judgment.

"c. Section 3700 of the Penal Code — Concerning prisoners under sentence of death and found to be insane.

"d. Section 2960 of the Penal Code — Prisoners found to be insane upon expiration of prison sentence.

"e. Section 5100 of the Welfare and Institutions Code — Other patients under civil commitment who might present a serious custodial problem."

On June 1, 1960, the Director of Mental Hygiene ordered petitioner transferred to the Medical Facility and the Director of Corrections authorized receipt of the patient. On June 7, 1960, the transfer was effected.

It appears from certificates of officials of Atascadero State Hospital and the Medical Facility that petitioner (born in 1931) entered upon a career of crime at the age of 10 years, has a history of violent conduct in, and escapes from, various institutions and is manifestly homicidal and suicidal. According to the Atascadero authorities, petitioner is "a severe

paranoidal sociopathic personality, who is extremely dangerous to himself, the staff, personnel and patients of this institution, and represents a serious escape risk and threat to the safety of the public,'' and ''presents custodial problems which require custodial management and facilities to control in excess of that which Atascadero State Hospital and all other institutions within the Department of Mental Hygiene are capable of providing.''

Even since petitioner has been confined under maximum security at the Medical Facility he has managed to fashion and attempted to secrete various weapons and, when they were discovered by the authorities, he has announced that he planned to use them to kill someone.

The physicians responsible for the care of mentally afflicted patients at the Medical Facility certify that ''Cathey is accorded the type of care and treatment available also in the Department of Mental Hygiene plus the safety precautions for which the California Medical Facility is equipped . . . Cathey is not treated with any less attention, regard, or sense of responsibility for his physical and mental welfare than any other patients of the institution who present similar problems.''

Petitioner argues that the Department of Mental Hygiene has no authority to transfer a person committed to its jurisdiction to a facility of the Department of Corrections. It is contended that the following provisions of the Welfare and Institutions Code specifically limit allowable transfers:

''The Department of Mental Hygiene . . . may . . . transfer any inmate of a state institution under its jurisdiction to *another such institution* . . . in accordance with the provisions of Section 6700 of this code.'' (§ 163; italics added.)

''Whenever, in the opinion of the Director of Mental Hygiene, it appears that a person committed to the Department of Mental Hygiene for placement in a designated institution would be benefited by a transfer from that designated institution to another institution *in the department,* the director may cause the transfer of the patient or inmate from that institution to another institution *under the jurisdiction of the department.*'' (§ 6700; italics added.)

''The Director of Mental Hygiene may authorize the transfer of persons from any institution within the department to any institution authorized by the *Federal Government* to receive such person.'' (§ 164; italics added.)

Other statutes authorize transfers of persons under the

custody of the Department of Corrections and the Youth Authority.[5]

We cannot agree that the foregoing specifications of permitted transfers preclude the transfer of this petitioner in accord with the above quoted interagency agreement entered into under section 11256 of the Government Code. A holding that because some transfers are expressly authorized by statute the two departments here concerned cannot effectually agree, pursuant to section 11256, to the subject transfer of petitioner, would cast grave doubt on the utility of that section, for it might then be argued that no agency could contract with another department for services or facilities which the first agency itself was not expressly authorized by statute to provide. "[G]overnmental officials may exercise such additional powers as are necessary for the due and efficient administration of powers expressly granted by statute, or as *may fairly be implied* from the statute granting the powers." (*Dickey* v. *Raisin Proration Zone No. 1* (1944), 24 Cal.2d 796, 810 [5] [151 P.2d 505, 157 A.L.R. 324].)

The above quoted and summarized provisions of the Welfare and Institutions Code and the Penal Code are not a systematic and complete scheme for transfers of inmates which impliedly excludes any transfer not expressly permitted. "In such circumstances the maxim '*expressio unius est exclusio alterius*' and other rules of construction have no application. Those rules will not be utilized to contradict or vary a clear expression of legislative intent in a matter of such vital concern to the people of the state." (*Dickey*

---

[5]The Youth Authority may transfer persons over 18 years of age who are subject to its control to the Medical Facility, the State Prison at Soledad, the Institution for Women at Corona, or the Institution for Men. (Wel. & Inst. Code, § 1755.5.) Also the authority may "make use of law enforcement, detention, . . . medical, educational, correctional, segregative and other facilities, institutions and agencies, whether public or private, within the State." (Welf. & Inst. Code, § 1753; see *People* v. *Scherbing* (1949), 93 Cal.App.2d 736, 740 [209 P.2d 796].)

The Director of Corrections may transfer mentally ill or mentally deficient prisoners to hospitals under the jurisdiction of the Department of Mental Hygiene. (Pen. Code, § 2684.) He may transfer prisoners from one institution of the Department of Corrections to another (Pen. Code, § 5080) and, particularly, to the Conservation Center (Pen. Code, § 6208), the medium security prison authorized by section 2046 (Pen. Code, § 2046.2), and the Correctional Institution at Tehachapi (Pen. Code, § 2048.2).

And the sheriff may remove a prisoner to a state prison when there is reasonable ground to believe that he "may be forcibly removed from a county jail." (Pen. Code, § 4007; *People* v. *Hodge* (1957), 147 Cal. App.2d 591, 595 [7] [305 P.2d 957].)

690

v. *Raisin Proration Zone No. 1* (1944), *supra,* p. 811 [6]
of 24 Cal.2d.)

 The Penal Code (§§ 1370, 1372 quoted *ante,* foot-
notes 3, 4) evidences a legislative intent that a person men-
tally unable to defend against pending criminal charges
should be hospitalized. But we find nothing in either
the Penal Code or the Welfare and Institutions Code to
suggest that the Legislature contemplated that the Depart-
ment of Mental Hygiene must build and maintain a high
security, prison-like hospital and staff it with personnel
trained as guards in addition to persons trained in work with
the mentally ill, so that society, hospital staff and inmates
can be protected from persons such as petitioner. In fact
there is legislative recognition that mentally afflicted persons
not serving a sentence after conviction of crime may require
protective detention in high security facilities under the juris-
diction of the Department of Corrections. Under Sec-
tion 7051 of the Welfare and Institutions Code[6] "defective
or psychopathic delinquents" can be confined in state prison.
(See *People* v. *White* (1960), 177 Cal.App.2d 383, 384 [1]
[2 Cal.Rptr. 202].)

It has already been mentioned (*ante,* p. 686) that Penal
Code, section 1370, under which petitioner stands committed,
does not require that a defendant in the circumstances of
petitioner be committed to the Department of Mental Hy-
giene; rather, it provides that "the court must order that he
be . . . committed by the sheriff to a state hospital for the
care and treatment of the insane, and that upon his becoming
sane he be redelivered to the sheriff. . . ." The California
Medical Facility at Vacaville indubitably is "a state hospital
for the care and treatment of [among others] the insane."
 The fact that such hospital is under the jurisdiction
of the Director of Corrections is not in any event prejudicial

---

[6]Section 7051 provides, "The Director of Institutions, with the ap-
proval of the Department of Finance, may provide on the grounds of
an existing State institution or institutions . . . institutional units to
be used for the custodial care and treatment or [of] defective or psycho-
pathic delinquents. Each such unit . . . shall be administered in the
manner provided by law for the government of the institution in which
such unit is established." A "defective or psychopathic delinquent"
is "any minor who is mentally defective or psychopathic and who is an
habitual delinquent or has tendencies toward becoming an habitual de-
linquent, if his delinquency is such as to constitute him a menace to the
health, person, or property of himself or of any other person, and the
minor is not a proper subject for commitment to a State correctional
school, to a State home for the feeble-minded . . . or to a State hos-
pital. . . ." (Welf. & Inst. Code, § 7050.)

to any right of this petitioner. He is, it must be recalled, not a mere mentally ill patient, committed only for treatment as such. By contrast, he is a defendant being held for multiple trials (when he recovers sanity) on various felony counts including one nonbailable charge of murder in San Luis Obispo County and a similar charge in Los Angeles.

Petitioner also urges that the Director of Mental Hygiene could not, on June 1, 1960, order the transfer of petitioner to the Medical Facility because petitioner on June 1 was in the actual custody of the sheriff of San Luis Obispo County awaiting the trial court's determination (not made until June 6) as to petitioner's then sanity. Furthermore, petitioner asserts, the transfer order of June 1, 1960, was ineffective because the interagency agreement of May 24, 1960, pursuant to which the transfer was made, was not approved by the Director of Finance until June 2, 1960 (see Gov. Code, § 11256, *ante*, p. 686). These arguments are so mechanically technical as to require no particular discussion.

Petitioner contends that "there was an improper introduction of evidence" on behalf of respondent. Respondent filed, as exhibits to the returns to the orders to show cause, declarations of institutional officials made under penalty of perjury and certified copies of institutional records and rules. Petitioner principally objects to a certificate of the superintending physicians at Atascadero which gives an account of petitioner's violent past in the form of a summary of "the records on file at this institution." Petitioner complains that "It is a breach of medical ethics to make public the private and confidential medical history of petitioner." Petitioner himself caused his mental condition to be put in issue by his application for habeas corpus and the averments of his briefs made under penalty of perjury. The situation is analogous to that of a plaintiff who brings a personal injury action, and the following explanation of the exception to the physician-patient privilege in such an action applies: "The whole purpose of the privilege is to preclude the humiliation of the patient that might follow disclosure of his ailments. When the patient himself discloses those ailments by bringing an action in which they are in issue, there is no longer any reason for the privilege. The patient-litigant exception precludes one who has placed in issue his physical condition from invoking the privilege on the ground that disclosure of his condition would cause him humiliation." (*San Francisco Unified Sch. Dist.* v. *Superior Court* (1961), *ante,*

pp. 451, 454-455 [11 Cal.Rptr. 373, 359 P.2d 925]; *City & County of San Francisco* v. *Superior Court* (1951), 37 Cal.2d 227, 232 [4] [231 P.2d 26, 25 A.L.R.2d 1418].)

Petitioner further complains that the certifying doctors did not know of their own knowledge the asserted facts which they summarized from records of institutions other than Atascadero. So far as appears, however, such records are authentic copies of original entries made in the regular course of operations of the various institutions where petitioner was confined, and such authentic copies were transmitted to Atascadero in the regular course of intrainstitutional operation at the time petitioner himself was first transferred there.[7] The records themselves, therefore, would be admissible under the Uniform Business Records as Evidence Act. (Code Civ. Proc., §§ 1953e-1953h.) And presentation of the contents of petitioner's voluminous records in the form of an expert summary prepared by the physicians-administrators is proper under the rule that writings can be proved by such a summary "[w]hen the original consists of numerous . . . documents, which cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole." (Code Civ. Proc., § 1855, subd. 5.) Other complaints of petitioner concerning the evidentiary effect of the exhibits furnished by respondent are not of sufficient moment to require discussion.

After the institution of this proceeding the Legislature enacted section 6700.5 of the Welfare and Institutions Code[8] to permit transfers of inmates in circumstances similar to those contemplated by the previously discussed interagency

---

[7]Petitioner was originally transferred to Atascadero from Arizona State Hospital on February 25, 1959. He was discharged from Atascadero in March 1959. In May 1959 he did the acts which resulted in his prosecution in Los Angeles for murder, assault and robbery. That prosecution, as stated *ante*, p. 685, was suspended and petitioner was again committed to Atascadero.

[8]Section 6700.5 of the Welfare and Institutions Code provides that "Whenever, in the opinion of the Director of Mental Hygene and with the approval of the Director of Corrections, any person who has been committed to a state hospital pursuant to provisions of the Penal Code needs care and treatment under conditions of custodial security which can be better provided within the Department of Corrections, such person may be transferred for such purposes from an institution under the jurisdiction of the Department of Mental Hygiene to an institution under the jurisdiction of the Department of Corrections. . . ." (Stats. 1961, ch. 1.)

The legislation under discussion further states, "This act is an urgency measure necessary for the immediate preservation of the public peace, health or safety within the meaning of Article IV of the Constitution

agreement. Promptly after the new section became effective the Director of Mental Hygiene and the Director of Corrections, pursuant thereto, on January 31, 1961, executed a new order authorizing petitioner's transfer to the Medical Facility. We regard the enactment of section 6700.5 as a clarification of the propriety of a transfer such as petitioner's (which, as we have seen, had been validly effected in June 1960), not as an indication that the Legislature was of the opinion that the respective departments formerly had no power to make such a transfer.

Petitioner urges that due process is denied by permitting his transfer to an institution under the jurisdiction of the Department of Corrections without notice and opportunity to be heard. We are not here concerned with such hypothetical situations, suggested by petitioner, as the transfer of a mentally ill person to San Quentin for execution, if in the opinion of the Director of Mental Hygiene security demands such disposition. It is to be assumed that the director will order transfers only to an appropriate institution and only for good cause. The subject transfer was so ordered, for as we have seen the Medical Facility is by statutory definition (Pen. Code, § 6102, *ante*, p. 684) a hospital, and petitioner's institutional record shows that he should be subject to maximum security confinement. No need for notice and hearing prior to a transfer such as that of petitioner appears, for such a transfer does not change his *legal* rights or status.

 Petitioner contends, however, that *in fact* the care and treatment which he receives is that accorded convicted felons and not, as the doctors in charge of the Medical Facility certify, ''the type of care and treatment available also in the Department of Mental Hygiene plus the safety precautions for which the California Medical Facility is equipped.'' Petitioner is correct in his insistence that he is not serving a sentence as a convicted felon, but he is mistaken in his

---

and shall go into immediate effect. The facts constituting such necessity are:

''The Penal Code provides for commitment to state hospitals of certain persons who have been charged with criminal offenses. Some of these individuals now confined are extremely dangerous and require confinement in secure facilities for their own protection and for the protection of the public. The state hospitals are not provided with adequate security features for such individuals and it is necessary that they be confined in facilities of the Department of Corrections. In order to permit such confinement at the earliest possible time, it is necessary that this act take effect immediately.''

assumption that he is entitled to be treated exactly as he was at Atascadero. He has no right to be confined under circumstances which will give him the opportunity to kill or maim his custodians, his fellow inmates or himself, or to destroy the property of the institution where he is detained. He does have a right to care and treatment, within the limits permitted by the nature of the security risk which he presents, looking toward his restoration to sanity so that he can be tried on the pending criminal charges.

At oral argument counsel for the respective parties agreed that this court could resolve the factual issues as to the conditions of petitioner's confinement upon petitioner's declarations made in propria persona under penalty of perjury and upon the exhibits furnished by respondent, consisting of certified copies of institutional records and rules and declarations of institutional officials made under penalty of perjury.

In appraising those pertinent averments of fact which are in conflict, we find that significant doubt is cast upon petitioner's credibility by the following circumstances: He does not deny respondent's version of his homicidal attack on the psychiatric technicians at Atascadero, or of incidents at the Medical Facility when petitioner is described as having made, concealed and threatened to use weapons, yet he takes the trouble to controvert the details of two relatively unimportant altercations with fellow inmates at Atascadero which are mentioned in the certificate of the doctors in charge of that institution. Petitioner objects to the averred conclusions of institutional officials that he is now a dangerous custodial problem, yet he complains that the superintendent of Atascadero "saw no danger in petitioner when he was released from the said hospital on March 24, 1959." (See footnote 7, *ante*, p. 692.) Petitioner devotes much space to castigating the administration of Atascadero in respects irrelevant to petitioner's situation, including averments concerning escapes from that institution, but protests that he never attempted to escape from Atascadero.

In the light of petitioner's insistence that he is not a dangerous person, we cannot accept either his general allegations or his averments of particular instances of the use of asserted unnecessary force against him by attendants at the Medical Facility. Furthermore, petitioner's own descriptions of such occasions show that he has provoked the use of necessary restraint. Thus he complains of an instance when he "set fire to a pile of trash in his cell" and another

instance when, after he was visited by his mother, he refused to submit to a routine and reasonable "close body search" and admittedly used obscene language and made a lewd gesture toward the searching officer.

Petitioner complains of the fact that the segregation unit where he is confined is not staffed with psychiatric technicians but rather with correctional officers who are assisted by inmate attendants. As indicated above, we do not accept petitioner's averments that these attendants "know nothing but brutality." ▮▮▮ Nor can we agree with petitioner's contention that he has a legal right to be attended by "civil service employees" rather than "convicted felons." The attendants' convictions do not, as a matter of law, make them incompetent to assist in caring for and restraining the mentally ill.

The contentions of petitioner next discussed were advanced by him in propria persona before appointment of his present counsel and have not been elaborated upon by counsel. ▮▮▮ Petitioner complains that he is not allowed access to the institutional library or all the law books which he desires. Because of petitioner's dangerous propensities it is manifestly proper not to permit him to visit the library. He says that an official of the Medical Facility has informed him "that all hard covered books are potentially dangerous weapons." In the case of one with petitioner's demonstrated ingenuity in devising means for harming people this conclusion is justified. The authorities of the Medical Facility, within the scope of the agreement between the Department of Mental Hygiene and the Department of Corrections that those in petitioner's situation "shall retain their status as patients of the Atascadero State Hospital," can deny petitioner access to law books, except, subject to reasonable regulations, a copy of division 6 of the Welfare and Institutions Code (see Welf. & Inst. Code, § 7501.5).

Petitioner avers that "because of the efforts of institutional officials to prevent him having unhindered, uncensored, and speedy access to the courts, his petitions are delayed, the titles changed, and two (2) of his petitions for writs of habeas corpus were flatly stolen because they were 'too hot'; often petitioner's documents, legal, are mailed to the courts [after typing by the institutional pool] without his having had a chance to read them." He further avers that on one occasion, on the order of institutional officers, his private legal writings "were searched and seized by force and fear, and withheld

for about four (4) days," and on another occasion a doctor advised petitioner to "lay off the joint if you know what's good for you—keep this place out of your writs!"

One in petitioner's situation, like one imprisoned under a judgment of conviction of felony, "has a right to prompt and timely access by mail to the courts [citations] though as stated in *In re Chessman* [1955], 44 Cal.2d 1, 10 [279 P.2d 24], 'it would be manifestly impossible to allow prisoners "immediate access by mail to the courts . . . at all times." ' " (*In re Ferguson* (1961), *ante*, pp. 676-677 [12 Cal.Rptr. 753, 361 P.2d 417].) And if petitioner were required to "lay off the joint" he could not exercise his right to seek habeas corpus in order to correct unlawful conditions of confinement. Furthermore, petitioner cannot exercise his right of access to the courts if his "documents, legal" are subjected to tampering. On the other hand, security may necessitate interruption of petitioner's writing to permit a search of his documents, and censorship, with its necessarily entailed delay, properly requires that petitioner's documents addressed to the courts be read (not changed or destroyed) by institutional authorities.

Petitioner, however, has not shown how he has been harmed by the alleged alterations and destruction of his documents. He has been afforded access to this court; he was visited by court-appointed counsel; and if he had anything relevant to communicate to this court which his in propria persona documents had not contained he could and should have communicated it through counsel.

Petitioner further complains that, prior to the appointment of his present counsel, his correspondence with attorneys (not the attorney appointed by this court) was improperly restricted. In the case of *In re Ferguson* (1961), *ante*, p. 677 [12 Cal.Rptr. 753, 361 P.2d 417], we held that "it is an abuse of discretion for prison regulations to be utilized so as to deny an inmate the opportunity to procure with reasonable promptness, or to communicate with in a reasonably prompt manner, a member of the Bar on matters pertaining to alleged violations of the prisoner's legal rights allegedly suffered as a direct result of incarceration, even though the letter to the attorney may be critical of the prison authorities." This holding as to prisoners convicted of felony is equally applicable to one in petitioner's situation. And if petitioner wished to select and employ counsel of his own choice rather than accepting counsel appointed by this court,

undue restriction on his correspondence with attorneys in this regard would be improper.

Petitioner's averments, however, are not sufficient to show any infringement of his rights in this respect. He alleges that officials of the Medical Facility refused to mail two letters from petitioner to an attorney in San Luis Obispo. One of these letters, as quoted by petitioner himself, contains obscene language. The mailing of the obscenity was properly refused in accord with the rules of the Department of Corrections. The other letter which the authorities refused to send is described by petitioner as including "an accusation against an official at California Medical Facility." The rules of the department provide that the sending of "[l]etters criticizing or attacking the law, policies, rules or officials" is "contrary to Departmental policy." This rule cannot properly be applied in a manner contrary to the law enunciated in the Ferguson case, *ante*, p. 677 [12 Cal. Rptr. 753, 361 P.2d 417], so as to deny an inmate his right "of transmitting to the courts statements of facts which attempt to show any ground for relief." (*In re Chessman* (1955), *supra*, p. 10 [11] of 44 Cal.2d.) And "when a prisoner is writing to an attorney in an attempt to secure legal representation, he must be allowed to set forth factual matters even though derogatory or critical of the prison authorities, since he must persuade the attorney receiving the letter that the writer's rights as a prisoner truly have been violated, so as to interest that attorney in the prisoner's alleged case against the prison authorities." (*In re Ferguson* (1961), *ante*, p. 677 [12 Cal.Rptr. 753, 361 P.2d 417].) But petitioner does not allege facts showing improper application of the rule here. He does not state the nature of his "accusation against an official" or show that it had any connection with proposed action to vindicate petitioner's rights.

For the reasons above stated, the orders to show cause are discharged and the petitions for habeas corpus are denied.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.