[Crim. No. 12880. Second Dist., Div. Four. June 30, 1967.]

In re EDWARD BUNKER on Habeas Corpus.

[Crim. No. 12746. Second Dist., Div. Four. June 30, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. EDWARD H. BUNKER, Defendant and Appellant.

(Consolidated Cases.)

Edward H. Bunker, in pro. per., and Donald F. Roeschke, under appointment by the Court of Appeal, for Petitioner and for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Respondent and for Plaintiff and Respondent.

KINGSLEY, J.—Edward H. Bunker (hereinafter referred to as "defendant") is presently incarcerated in state prison under two judgments of the Superior Court of Los Angeles County.

In superior court case number 198278, he pled guilty, on March 3, 1958, to the crime of forgery; probation was denied and he was sentenced to state prison. On June 16, 1964, his term was fixed by the Adult Authority at eight years, and, on August 18, 1964, he was released on parole. Thereafter he was returned to prison as a parole violator, his parole was revoked, the term setting was vacated, and he is now held in state prison under the 1958 judgment with his term set at the maximum provided by statute (14 years) (Pen. Code, § 473). In part, his petition for habeas corpus challenged the validity of that confinement, defendant contending that, for reasons discussed below, the revocation of his parole was invalid and that, as a result, his term remains at eight years—a term,

according to his contention, completely served over a year ago.

While defendant was on parole from the 1958 sentence, he was arrested and charged with two counts of burglary and one of assault with a deadly weapon. Those charges ultimately resulted in the filing of an information in superior court case number 317687, his trial on that information, his conviction on May 27, 1966, on the two burglary charges (the assault count having been dismissed in the interest of justice), and his sentence to state prison, the sentences on the two burglary counts running concurrently with each other and concurrently with any unexpired sentence in case number 198278. He has appealed from that judgment; in addition, his petition for habeas corpus challenges the 1966 judgment on grounds hereinafter discussed.

Since, as will be seen, the contentions made on the appeal and on the petition for habeas corpus are, to some extent, interrelated, we deal with both cases in this one opinion. In so doing, we have considered, as bearing on the appeal, the appeal record, the briefs filed by defendant in propria persona and by respective counsel, the exhibits offered and those received in the trial court, the contents of the superior court file in case number 137687 and (it having been considered by the trial court) the superior court file in case No. 205699. In connection with the habeas corpus proceeding, we have considered all of the above matters, together with the additional briefs filed by defendant and by counsel in that matter and the documents attached to the return filed therein by the Attorney General. For the reasons hereinafter set forth, we conclude that the judgment of conviction should be affirmed and the petition for a writ of habeas corpus denied.

I

The attack on the confinement under the 1958 judgment is based on the following facts: Defendant was arrested for the offenses for which he was ultimately convicted in case No. 317687 on October 12, 1964. When he was arraigned in the magistrate's court, that officer declared a doubt as to defendant's present sanity, proceedings under section 1368 of the Penal Code were instituted and defendant was committed to Atascadero State Hospital. While he was being held under that commitment, on February 5, 1965, as a result of parole violation charges theretofore filed against him, his parole was "suspended," he was ordered returned to prison and the

setting of his term was vacated, resulting in an automatic resetting of his term at the maximum. On September 13, 1965, the Superintendent of Atascadero State Hospital filed his certificate that defendant had returned to sanity and he was returned from that institution to the municipal court. Before he was re-arraigned in connection with the 1964 charges, he was arrested in San Diego on the parole violation matter but, because the proceedings in case No. 317687 intervened, he was not physically returned to state prison until sometime in June 1966. Thereafter a copy of the parole violation charges was served on him. He declined to enter a formal plea, although the records before us indicate that he had denied some of the charges. On September 18, 1966, after due notice and hearing, defendant's parole was revoked, the revocation being expressly based on the portions of the charges which had not been denied by defendant.

 Defendant first attacks the action taken in February 1965 on the theory that, since he was then under confinement under a commitment based on a finding that he was mentally incompetent to stand trial, he was likewise incompetent to be the subject of parole violation proceedings. Defendant misapprehends the nature of the 1965 action. It was not a revocation of his parole; it was the suspension authorized by section 3060 of the Penal Code. Under the provisions of that section, the suspension may be without notice or hearing. Its effect is to authorize the return of the parolee to custody so that formal charges may be served on him and a proper revocation hearing be held. So far as defendant is concerned, the procedure was no different from, and had no greater effect than, the issuance of a bench warrant by a court after the criminal complaint has been filed. Defendant's parole was not effectively revoked and the re-fixing of his term of sentence did not finally become effective until the action by the Adult Authority on September 18, 1966[1]—a date when he was no longer held under any insanity commitment and when he does not contend that he was incompetent.

---

[1]The sundry documents before us suggest the possibility that the suspension of parole, imposed in February 1965, may have been lifted when defendant was discharged from Atascadero in September or October of 1965 in order to stand trial on the 1964 charges. The petition before us is not directed to that issue, nor are the records herein adequate to determine it. In any event, the matter will not become significant until 1971, at the earliest. We do not intend to express any opinion on the matter of the ultimate termination date of the 1958 sentence other than to hold that that sentence is now validly in force.

■ ■ As we understand it, defendant also attacks the parole revocation on the grounds: (a) that it rested in part on the 1964 offenses—offenses not adjudicated when the charges were filed; and (b) that the supporting data included evidence against him improperly obtained while he was in a county jail in San Diego. The first contention rests on the same misapprehension above considered. We need not determine whether a pending criminal charge, not yet adjudicated, can be the basis of a parole revocation. Since the revocation here followed, by over three months, defendant's conviction on the 1964 charges, the fact that those charges remained undetermined in the spring of 1965 is immaterial. A further answer to the first contention, and the answer to the second, is that the record discloses a series of undenied violations of the conditions of parole, independent of the 1964 offenses, and independent of and long prior to the alleged San Diego episode, any one of which constituted cause for parole revocation.[2]

Insofar as the petition for habeas corpus attacks the validity of defendant's present confinement under the 1958 sentence in case No. 198278, it states no facts justifying relief.

## II

In case No. 317687, as we have said, defendant was charged with two counts of burglary, in violation of section 459 of the Penal Code and with one count of assault with a deadly weapon, in violation of section 245 of that code. He was found guilty and sentenced on the two burglary counts; the assault count was dismissed. He challenges the judgment of conviction on several grounds. Recognizing that some of his contentions are not available on appeal, he also sought habeas corpus. Because all of his contentions are properly before us

[2]The charges not denied by defendant before the Adult Authority or here, not involving any of the 1964 offenses, and filed long before the San Diego jail commitment, were:
"(1) Edward Hurd Bunker violated Condition 2 of the Conditions of Parole by changing his residence without the approval of his parole agent. . . .
"(3) Edward Hurd Bunker violated Condition 6 of the Conditions of Parole by, . . . (b) failing to participate in the anti-narcotic program. . . .
"(5) Edward Hurd Bunker violated Condition 8 of the Conditions of Parole by associating with a parolee an individual of bad reputation.
"(6) Edward Hurd Bunker violated Condition 9 of the Conditions of Parole by operating a motor vehicle without permission of his parole agent.
"(7) Edward Hurd Bunker violated Condition 10 of the Conditions of Parole by failing to cooperate with his parole agent."

either on appeal or on the petition for habeas corpus, we deal with all of them on their merits and without always attempting to allocate any particular contention to either proceeding.

### III

We consider first whether or not the evidence produced and admitted at the trial, assuming that it was admissible, was sufficient to support the verdicts of guilty. In that consideration, we state the evidence (as we are required to do) in the light most favorable to the People. Defendant did not testify and no defense testimony was offered.

Count I involved a burglary of the Student Prince Bar, committed at about 7 a.m., on a Sunday morning. The premises were ransacked, the pay telephone was ripped from the wall and taken away, money in a cash drawer was taken, and a hole was punched in the safe and some money was fished out of the safe through the hole. A woman living next door heard noises coming from the bar. When she went onto her porch, she saw an automobile parked at the rear door of the bar and saw a man run from the bar, carrying a pay telephone, enter the car and saw the car drive off. She identified defendant as the man. The identification was not in a lineup but the police brought defendant for identification. When she saw him full face she was unable to identify him, but when he was turned so that she saw his profile (as she had seen the profile of the burglar) she immediately identified defendant. The identification was repeated on the stand.

On the following day, the house of a couple named Sibley was entered and various items of personal property, including a woman's coat were taken. A neighbor saw two men, one a Negro and one white, carrying clothing from the house and putting it in a light colored Buick which had no license plates. She was unable to identify defendant as one of the men.

When the owners of the burglarized premises returned, the neighbor reported her observations to them. The owner's stepson, Henry Lee, immediately drove to the home of a Lonnie Logan. On cross-examination, Lee testified that he suspected that Logan, with whom he was acquainted, had been one of the burglars. As Lee entered Logan's house, he met defendant leaving. He followed defendant to a car, parked at the curb, which fitted the description of the one seen at the scene of the burglary. On the back seat of the car he saw his mother's coat—one of the missing articles. He reached into the car and

retrieved the coat. Defendant pulled a knife and, while still sitting in the car, attempted to stab Lee with it. After a brief interval, defendant started the car and drove off, at high speed.

Shortly thereafter, Los Angeles police officers saw defendant driving a white Buick, without license plates, going through a red light. They gave chase and, after a chase of about five miles, over a twisting course, at high speed, during which defendant went through other red lights, he stopped the car and ran. He was followed and arrested. At the time of arrest, he made statements to the effect that he did not believe the officers were policemen, but that they were Catholic priests, engaged in harassing him.

Defendant was taken to the police station and, since he refused to give his name, he was booked as "John Doe I." At some later date, and in some manner never explained on the record, the name of "Marty Cagill, J.G., U.S.N.R." was also placed on the booking card.

The next morning, Officer Williams, after advising defendant of his constitutional rights in accordance with the requirements of *Dorado* [*People* v. *Dorado*, 62 Cal.2d 338 [42 Cal. Rptr. 169, 398 P.2d 361)],[3] began to question him, intending to secure statements about the Sibley burglary. According to the officer, defendant acknowledged that he understood the warning and, after a brief period of refusal to talk, suddenly began to confess to the Student Prince burglary. Since that offense was not one within Officer Williams' territorial or subject matter area of concern,[4] he terminated the interview and sent for Officer Lavold who was concerned with solving the Student Prince crime.

Interrogation of defendant resumed at 4:30 that afternoon, with both Officer Williams and Officer Lavold participating. Defendant was again warned of his rights. According to the

[3]The interrogation was on the morning of October 13, 1964, after the original opinion in *Dorado* (August 31, 1964), but while that case was pending on rehearing. We discuss later certain contentions made by defendant based on these dates.

In his brief on the appeal, defense counsel argues that the confessions were inadmissible because the warnings given did not meet the requirements of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Since the trial commenced on May 24, 1966, *Miranda* is not applicable. (*People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

[4]Since the Student Prince offense had involved theft from a safe, the safe-cracking detail of the police department had the primary task of investigation. Officer Lavold was called in because he was assigned to that specialized detail.

officers, he then confessed to both offenses, involving Logan as his partner in the Sibley burglary. Prior to confessing, defendant had again accused the officers of being Catholic priests in disguise and had expressed both fear of, and hatred for, Catholics. According to the officers, he was brought into a cooperative mood by their statements that neither was Catholic.

If the confessions obtained on October 13th were admissible, there can be no doubt of the sufficiency of the evidence. Without them, the evidence would support the conviction for the Student Prince burglary, although (as counsel argued to the jury) the eyewitness testimony was relatively weak. The evidence would also support the conviction for the Sibley burglary, although the evidence is far from strong, eyewitness identification is lacking, the connection with Logan remains unexplained, and only the presence of the coat in defendant's car and his violent reaction to its recovery actually connect him with that offense. As to the Sibley offense, thus, not only the admissibility but the credibility of defendant's confession is vital.

## IV

We turn next to consider the attacks made by defendant on the two confessions. He presents three arguments with reference to them:

(1) That they were "involuntary" in the traditional sense;

(2) That, assuming that the warnings of constitutional rights were given as claimed, there was no valid waiver of those rights; and

(3) That the entire story of his confessions is perjury, designed to cover up an illegal search and seizure. The first two contentions were made and argued at the trial and come before us on the appeal as well as on the habeas corpus petition; the third contention is raised for the first time in the habeas corpus proceeding.

The first contention rests on two arguments: (a) That the confessions were illegally obtained, since defendant had been in custody for some 18 hours without being taken before a magistrate; and (b) That defendant was mentally incompetent to make a "voluntary" confession.

The first argument, urged with vigor at the trial, is without merit. ▪ The so-called *McNabb* rule,[5] on which it is

---

[5]*McNabb* v. *United States* (1942) 318 U.S. 332 [87 L.Ed. 819, 63 S.Ct. 608].

based, applies only in the federal courts and has never been part of the law of California. (Witkin, Cal. Evidence (2d ed. 1966), § 487, pp. 454-455.) It should be noted that, according to the officers' version, there was, in any event, no lengthy delay nor any long continued series of interrogations. Defendant was arrested at about 8 p.m., Officer Williams first interviewed him at about 9:30 the next morning; the delay until 4:30 was not unreasonable in view of the desirability of securing the presence of Officer Lavold.

The second argument rests on two factors. In the first place, defendant argues that the evidence of his remarks to the arresting officers and, later, to the interrogating officers, concerning his fear of a Catholic conspiracy, shows that he was subject to delusions and that his delusions affected his capacity to make a voluntary confession. The other argument is based on the fact that, as above set forth, he was shortly thereafter committed to Atascadero State Hospital, under Penal Code section 1368, as a person mentally incompetent to stand trial. He urged at the trial, and here, that if his condition when he was arraigned on October 22d was such as to raise a doubt of his sanity in the mind of the magistrate and if his condition on November 2d was such as to call for his commitment, then he must have been similarly incompetent on October 13th.

Although resting on a different legal theory, the contention that defendant had not intelligently waived his right to remain silent is based on the same arguments as we have just set forth in connection with the claim that the confession was involuntary. It is urged that the capacity to understand *Dorado* type warnings and capacity to make an intelligent waiver of *Dorado* rights involves the same mental process as does the capacity to participate in tactical and strategic decisions during the trial and that a defendant incompetent to stand trial is, *a fortiori*, incompetent to waive constitutional rights.

The argument is persuasive and it was presented to the trial court with skill and vigor by defendant's trial counsel. But the court had before it the testimony of the police officers, who had regarded defendant as understanding his rights, and a block of psychiatric reports based on a series of examinations, including the reports before the court in the section 1368 proceeding. The trial court, after considering all the data presented to it, and after argument, ruled that the confessions were admissible.[6] In addition, the question of voluntari-

---

[6] "I have considered the fact and read the medical records in the Bunker sanity hearing of the Superior Court 205699, and the basis for the

ness and the question of waiver of the right to remain silent were both presented to the trial jury under instructions not here questioned.[7] ██ The issue was one of fact; neither the trial court nor the jury was necessarily bound to find that defendant was incompetent on October 13th to such an extent that he could not understand the *Dorado* warning and intelligently elect to disregard it or to such an extent that he could not give an accurate account of the two crimes involved. We have no power to overturn the factual determination thus made.[8]

The perjury argument rests on the following theory: It appears from sundry documents in the record now before us on the habeas corpus proceeding, as well as from at least one document in the superior court file, that, after defendant's arrest, his car was searched, resulting in the discovery of the knife used in the assault on Lee and a hotel key and that, using the key, officers had searched defendant's room, finding loot from the Student Prince Bar burglary as well as documents identifying defendant. Defendant argues that it was this search (clearly illegal under *Stoner* v. *California* (1964) 376 U.S. 483 [11 L.Ed.2d 856, 84 S.Ct. 889]) that led to his identification with the Student Prince burglary, that Officer Williams knew this when he first interrogated defendant and that the entire testimony of Officers Williams and Lavold was an elaborate perjury, designed to cover up the illegal search.

The argument is ingenious, but the facts as we can discover them do not justify relief on habeas corpus. ██ Perjury per se is not a ground for collateral attack on a judgment; it must appear that the prosecution knowingly offered the perjured testimony knowing it to be perjured. The record would support a finding that the deputy district attorney had seen police reports of the search and that the fact of that search was sufficiently well known by February 16, 1966, so that Dr. Crahan knew of it when, on that date, he conducted an examination of defendant under section 1871 of the Code of Civil Procedure. But there is no evidence that Officer Williams, or

psychiatrists' reports were given there. I have considered the statement of the officer who told the details surrounding the alleged confession in the morning, and the details surrounding the conversation in the afternoon, when Officer Lavold was present, and I will allow the jury to hear it.''

[7]The trial court gave CALJIC No. 29 (re-revised), 29-A.1, 29-A (re-revised) and (on the *Dorado* point) 29-B (new).

[8]We discuss later the contention that the trial court considered improper data in reaching its determination.

even Officer Lavold, knew of the search on October 13, 1964, and none at all to suggest that the deputy district attorney knew, at the time of trial, what, if anything Officers Williams and Lavold had known on October 13th. Defendant makes much of the fact that, when the prosecutor began to inquire into the search of the car, and defense counsel sought to conduct a *voir dire* inquiry into the circumstances of that search, the prosecutor dropped the matter.[9] We can see in this no effort to hide the facts of the search. In fact, the prosecutor was well on his way to disclosing the episode. That he abandoned that line of inquiry shows no more than that he was content to rest on the evidence otherwise available.

In other words, nothing in the records before us justifies more than a vague suspicion of wrongful conduct. No evidence found by the search of the room was offered against defendant. ■ Nothing supports the hypothesis that it was that search, and not defendant's blurted out confession, that caused him to be suspected of the Student Prince burglary. Nothing at all, in any way derived from the search, could have connected him with the Sibley burglary; he was connected to that crime by his flight and Lee's identification.[10]

Defendant points to the fact that the confession interview was not recorded and that no stenographer was present. Officer Williams testified that he made notes of the confession on the back of the envelope containing defendant's police records and that he read them over to defendant who stated that they were correct. All of this was brought out on cross-examination and both the trial court and the jury were well

[9]"Q Did you observe, sir, the contents of Bunker's vehicle on that date?

"A I did.

"Q Are you able to tell us, sir, what if anything that vehicle contained?

"Mr. WARNER: Object to that, Your Honor, upon the ground—it would be legal argument on this objection, Your Honor. May I approach the Bench? It would be rather extensive Voir Dire examination to possibly be conducted in the absence of the jury, Your Honor.

"Mr. BLOOM: I will withdraw the question."

[10]Defendant, in one of his pro. per. briefs, argues that the testimony that officers gave *Dorado* type warnings in October of 1964 is incredible, since the final opinion in *Dorado* was not filed until January of 1965. But the first opinion in *Dorado* was filed on August 31, 1964. We know, from a substantial number of records before us, that, at least in Los Angeles, the police department, even after a rehearing was granted in *Dorado*, elected to follow the more cautious course and comply with the requirements of the original opinion even though they undoubtedly hoped that that precaution would turn out to have been unnecessary. The testimony about the warning is, thus, not incredible.

aware of it and of any implications that could be drawn from it.

We conclude that the evidence supports the admissibility of the confessions and that the petition for habeas corpus does not set forth facts sufficient to justify relief on the theory of an intentional use of perjured testimony.

## V

Defendant contends that the trial court's determination of the admissibility of the confessions was based, in part at least, on opinions expressed by the Department of Corrections and on a report of a conversation between defendant and a representative of his attorney, occurring while defendant was in the San Diego jail. The purported transcript of the jail conversation presented to us is far from satisfactory, either as to the persons involved or the circumstances surrounding its making. However, for the purpose of the present proceeding, we assume that it does represent an improper invasion of the attorney-client privilege. But, while the record shows that this material, together with other data, was presented to Judge Allen Miller of the superior court when a motion under section 995 of the Penal Code had been on his calendar, there is nothing to show that any other judge ever saw it. A motion to disqualify Judge Miller was made and allowed, the section 995 motion proceeded before Judge Lawler, and the trial was before Judge Shidler. ▮ The only point in the entire record when this material was in any way brought to the attention of Judge Shidler was at a later point in the trial, and long after he had ruled on the admissibility of the confessions, when defendant made the motion, hereinafter discussed, to discharge his trial counsel. The record shows that the trial court then read the portion of a report from the Department of Corrections which referred to the search of defendant's room, but that he was not asked to read, and expressly refused to read, anything else. Clearly, nothing other than the testimony given at the trial, and the sundry psychiatric reports, were considered by the trial judge in reaching his determination.

## VI

Defendant contended by his motion under section 995, at the trial, and here, that the trial court had lost jurisdiction to try him because of an illegal delay in bringing him to trial.

That contention, as now before us, is twofold: (1) That there was an improper delay from April until September

1965, in returning him from Atascadero State Hospital for trial; and (2) that the delay from the time he was returned to court until the formal preliminary examination was also so long as to constitute a denial of his right to a speedy trial.

The record does not support the first contention. After defendant was committed to Atascadero, he was transferred for custodial purposes to Vacaville, pursuant to section 6700.5 of the Welfare and Institutions Code (see *In re Cathey* (1961) 55 Cal.2d 679 [12 Cal.Rptr. 762, 361 P.2d 426]).

 . While he was so confined, Dr. Keating, the Superintendent of Vacaville, expressed his opinion that defendant was sane enough to be returned for trial. But the power to order defendant's return was not vested in Dr. Keating, who was a mere custodian of defendant's person. The power and duty to determine defendant's restoration to capacity was vested by law in the Superintendent of Atascadero (Pen. Code, § 1372). The record before us, which includes (at defendant's request), the records of both Vacaville and Atascadero, show that defendant continued, after Dr. Keating had expressed his opinion, to behave in a dangerous and assaultive manner. While the Superintendent at Atascadero could have taken the opinion of Dr. Keating (a qualified psychiatrist) into consideration, and presumably did so, he was not only entitled but obligated to observe defendant after he had been returned from Vacaville to Atascadero, to weigh defendant's continued aggressive conduct in both institutions, and to consider the opinions of his own staff, before reaching the decision to order defendant returned for trial. The record shows ample reason for holding defendant, after Dr. Keating had made his judgment, while the officer who had the legal duty to make the legal decision conducted his own observation and check.

Defendant also now urges that there was an unreasonable delay from the time when he was returned to court, in October 1965, until his preliminary examination in January 1966.[11] The facts with reference to that delay appear only by inference, defendant not alleging any detail concerning them. Examination of the sundry documents before us[12] indicates

---

[11]No complaint is made of the time that elapsed after defendant's preliminary examination began in January 1966.

[12]The superior court file includes the bail bond which guaranteed defendant's appearance on October 21st in municipal court, and papers relating to the forfeiture and reinstatement of that bond which include defendant's declaration that he had not appeared as directed because he was then in jail in San Diego.

that, on defendant's return to court, his hearing was set for October 21, 1965, and that he was admitted to bail. Before the date set for the preliminary hearing, he had been arrested in San Diego for some offense not disclosed (apparently a misdemeanor) and had been sentenced to jail in that city. He was ultimately released from the San Diego jail to the custody of the Anaheim Police Department and by them released to the Sheriff of Los Angeles County. On the record which defendant has presented to us, we cannot say that there was such a delay in holding the preliminary examination as to have amounted to a violation of constitutional rights. Nor does defendant anywhere suggest that the delay from October until January prejudiced him in his trial for offenses already a year past.

## VII

Finally, defendant urges that he was denied effective representation by counsel. He was represented at the proceedings below, commencing with the motion under Penal Code, section 995, by counsel of his own choosing. On May 26, 1966, at the beginning of the third day of trial, he made a formal motion to discharge that attorney and to have the court appoint another attorney for him. The request was denied.[13] The contention is renewed here on the same grounds urged on the trial court, but amplified in detail.

The request to the trial court was not merely to relieve the attorney, with defendant thereafter representing himself, but for the substitution of new counsel to continue a trial almost concluded. Since, as will appear, there had been no ineffective representation, the trial court was entirely correct in denying the motion as made to it. ▇▇▇ The right of defendant to change counsel in mid-trial is not absolute, but the trial court must weigh defendant's desires against the effect on the effective administration of justice (*People* v. *Byoune* (1966) 65 Cal.2d 345, 347 [54 Cal.Rptr. 749, 420 P.2d 221], and authorities there cited.) We cannot say that that discretion was abused here.

---

[13]"THE COURT: . . . Well, this document is in essence a request. It's a petition for Mr. Bunker to relieve counsel and to have me appoint another attorney to take his place. It states that you do not want the Public Defender to represent you.

"DEFENDANT BUNKER: If that's absolutely necessary, I would accept the Public Defender over objection. I think the Public Defender's caseload is too heavy to handle cases this technical.

"THE COURT: The problem is that if I acted to employ another counsel, I would have to declare a mistrial in this case, because no counsel could come into the case as it stands now."

We have read the reporter's transcript of the trial, which includes the *voir dire* of the jury and the final arguments to the jury. ▆▆▆ Counsel urged the problem of delay in bringing defendant to trial; he sought, with diligence and perseverance, to examine the police file relating to defendant's arrest and related matters and ultimately secured access to all of that data; he argued skillfully the admissibility of the confessions; he cross-examined the identification witnesses, bringing out the weaknesses therein, and he argued the case to the jury at length and with ingenuity. Admittedly, defendant personally had master-minded much of the trial tactics and strategy; if the distractions of his interruptions caused counsel to miss some fine point in cross-examination, defendant cannot complain of it here.

The real gist of defendant's attack on his trial counsel is that the attorney did not make use of the report from the Department of Corrections to which we have referred above. But, while that document could possibly have been used to support the charge of perjury against the police officers, its presentation to the court would necessarily have opened the door for the introduction of other material which would have affected defendant adversely. And if the perjury issue had been carried forward beyond *voir dire* into the trial, as it undoubtedly would, the jury would have been told, out of defendant's own exhibit, the incriminating data resulting from the search of his room—thus waiving the protection which *Stoner* otherwise gave to him. This was a tactical decision which it was within the province of counsel to make; even with the benefit of hindsight we cannot say that he was wrong.

In summary, an examination of all the records presented to us discloses no errors at the trial and no allegations of fact sufficient, even if true, to entitle defendant to relief on habeas corpus. It follows that the judgment should be affirmed and the petition denied. It is so ordered.

Files, P. J., and Jefferson, J., concurred.

A petition for a rehearing was denied July 10, 1967, and appellant's petition for a hearing by the Supreme Court was denied September 27, 1967.