[Crim. No. 13897.   Second Dist., Div. Five.   June 13, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES KENNETH ELIAS, Defendant and Appellant.

---

[3]Section 817 of the Penal Code includes parole agents in the definition of peace officers.

David M. Rothman, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Edmond B. Mamer, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, P. J.—Defendant was charged with the murder of his baby stepson Ronald. He pleaded not guilty and not guilty by reason of insanity. After a court trial he was found guilty of murder in the second degree. The court found that he had been sane at the time of the murder.

On appeal the sufficiency of the evidence to support the finding of guilt and the determination that defendant had been sane is conceded. Therefore, we omit any description of the crime. ■ Defendant's only point is that certain incriminating statements should not have been admitted in evidence. He argues that in view of his mental condition he lacked any capacity to waive his constitutional right to silence.

These are the facts surrounding defendant's incriminating statements: defendant was arrested at 1:30 p.m., at his sister's home, about a month after the murder. He was given a warning which in all respects complied with the mandate of *Miranda* [384 U.S. 436 (16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974)]. Sergeant Smith, one of the arresting officers, asked defendant whether he understood what he was being told. Defendant remained mute. Smith then repeated the *Miranda* warning and again asked defendant whether he understood. Defendant said that he did. At that moment defendant's sister interrupted and told the defendant "not to ask the police any questions and not to say anything . . . and to remain perfectly silent." Defendant was then placed in a police car. On the way to the station defendant spontaneously said that he had lied about something when he had originally

talked to the police and that he wanted to straighten it out. He continued: " 'My wife and myself talked it over before we talked to the police, and she suggested that we didn't say she was at work when the baby fell off the bed because we didn't want anyone to know she was dancing in a bar and under 21 years old.' "

At that point the car arrived at the station. While the officers were filling out a form, again without any interrogation, defendant continued to talk: " 'I love my wife very dearly. I didn't want to hurt her or the baby. I was driving a catering truck and the hours were from 4 a.m. to 2 p.m. I got tired of getting up so early, and my route started to go bad. I came home one night, I think it was a Friday night and asked my wife to go to the corner liquor store for some cold cuts because we couldn't afford to go to dinner. While she was gone the baby got hurt. I told her and everyone else that someone must have came into the house and slapped the baby. Looking at it now, I know I must have done it. I guess my mind must have gone blank. The night before we took the baby to the hospital I gave the baby a bath and put him on our bed to dry him off. The phone rang and I went and talked to my mother, and as I was hanging up the phone I heard the baby fall off the bed. I picked him up and patted him and he stopped crying, so I dressed him and put him to bed. When my wife got home I told her he had fallen off the bed. The next morning we took him to the hospital. I know I must have slapped the baby the first time, and I'm sure I slapped him around the second time before we took him to the hospital, but my mind is completely blank as to what happened.' "

Later that day defendant was taken to division 68 of the municipal court where he talked to Mr. Newman, a deputy public defender. Defendant was sitting in the jury box and indicated to the arresting officers that he wanted to talk to them and that he did not want Mr. Newman present. Officer Gastaldo — one of the two policemen — asked defendant whether he had heard correctly, whether he really wanted to speak to the officers and not to the public defender after having been advised of his rights and having indicated that he understood them. The public defender also advised defendant not to discuss the case with the officers and that he need not talk to them. Nevertheless, defendant insisted and went into a back room with the officers where he made the following statement: " 'I can't stand living with this. I've got to tell you the truth. I have never told this to anyone else and it's

killing me. Everything I told you before is true, but I didn't tell you my part in it. The first time[1] the baby got beat up it was by me. I love my wife and I love the baby and I don't know why I did it. When my wife went to the store the baby started crying while he was in the crib, and I went into the bedroom and just started slapping the baby.' ''

Gastaldo then asked defendant whether he had kicked the crib. Defendant said: '' 'Yes, I kicked the crib and it broke after that. After it was over I was so ashamed of myself I didn't know what to do. When my wife came home I made up that story, called my mother and had her look at the baby. My mother didn't think the baby was too bad, so we didn't take it to a doctor, and I didn't want to call the police because I didn't want my probation officer to know about it. I hadn't told him I was married or anything.' ''

After confirming that the foregoing statement referred to May 13, defendant went on: '' 'On the 28th day of May my wife went to work and I gave the baby a bath like I told you earlier. I put him on the bed and the phone rang, and after I had talked to my mother the baby did fall off the bed. He started crying, and I don't know what came over me. I just started slapping him around. I threw him around like you would a pillow and was hitting him. I remember throwing him on the sofa in the living room, and he fell off of that onto the floor, too. I don't recall exactly how I hit him except to say I beat him like you would a pillow. He finally stopped crying and I put him to bed. Afterwards, I had time to think about it, and I felt real bad.' ''

At some point during this conversation one of the officers asked defendant whether during the beating he could have struck the baby on both sides of the head simultaneously. Defendant replied: ''Yes, possibly I did.'' He gave the same reply to a further question, whether he had hit the baby with clenched fists.

Before the trial defendant was examined by three psychiatrists, Doctors Abe, Boner and Jacobi. Their reports were admitted in evidence by stipulation. All three psychiatrists also testified. Doctor Abe and Doctor Boner both found defendant to have been legally sane at the time of the murder, Doctor Jacobi—after far more extensive examinations than those performed by the other two—found him to have been insane and incapable of harboring malice aforethought.

---

[1]Defendant here was talking about an incident on May 13, 1966, about two weeks before the murder.

Doctor Abe's diagnosis ends as follows: "Clinically, defendant appears to have a paranoid personality, but there is no evidence that he had a psychotic mental condition, causing unreal thinking or distortion of judgment at the time of the offense or at the present time of the examination."

Doctor Boner found as follows: "Mentally, the defendant is of dull average intelligence, in good contact with reality, verbalizing freely, relevantly and coherently. His memory for details was unimpaired for recent or remote events. . . . Hallucinations or delusions were not elicited. The past history of the individual indicates a marginal adjustment socially and occupationally, probably due to lack of education or training and a lack of definiteness of purpose in life. However, his past history does not reveal a schizophrenic pattern or psychotic personality but rather a conduct disorder on the basis of an Adjustment Reaction of Adolescence."

Doctor Jacobi, though finding defendant capable of understanding the nature and purpose of the proceedings against him, summarized his findings as follows: ". . . At the time of the alleged offense, the defendant was acutely mentally ill. His judgment, will, understanding and appreciation were virtually absent at the time of the offense, due to an acute schizophrenic decompensation. This acute disintegration stemmed from severe psychological forces, stressing the defendant at the time of the offense, who was already suffering from a chronic underlying psychotic process. His unbelievable act derived from rage of psychotic proportions, vitiating his understanding and appreciation of the nature and consequences of his acts, and that he was doing wrong in relationship to that act at the time of the offense. (He is still unaware that he was psychotically enraged at the time of the offense.) At the time of the offense, therefore, he was unable to comprehend his obligation to conform his conduct to society's laws."

The Attorney General contends that no proper objection to the admission of defendant's statements was made below. The point has merit. Although trial counsel indicated early in the proceedings that he would object to the admission of the statements, he did not really pursue the matter. When Officer Smith was called at the trial[2] and asked whether defendant

---

[2] All defendant's statements are contained in the transcript of the preliminary hearing which was admitted by stipulation subject to the defense objection. Smith was called at the trial to provide further details.

had said that he could have struck the baby on both sides of the head the following took place: ". . . MR. RASMUSSEN: I object on the ground that there is no showing any constitutional rights were given to him by this officer, no showing that he was in a mental condition to understand any constitutional rights that were given to him, but no showing that any statement he made was given freely and voluntarily. MR. KATZ: Your Honor, I am not sure what the purpose of the submission on the transcript was. These statements are already in. The constitutional rights have already been given and are contained in the transcript. MR. RASMUSSEN: And I previously notified the District Attorney in our last proceeding that I was objecting to those conversations on the ground that the defendant was so mentally ill, he couldn't understand, he couldn't waive his constitutional rights. MR. KATZ: That is true. Mr. Rasmussen did make that representation. MR. RASMUSSEN: And in fact, I wish to—perhaps the Court could take this objection under submission until Dr. Jacobi testified and then rule on it at that time. THE COURT: Very well, I will receive it subject to a motion to strike, if that's what you are asking for, Mr. Rasmussen. MR. RASMUSSEN: Yes, your Honor. . . ."

Later Doctor Jacobi was asked whether in his opinion defendant could make a free and voluntary waiver of his constitutional rights. The doctor replied that in his opinion there would be a question whether defendant was capable of waiving his rights if, at the time of his incriminating statements he had just been told "that the child that was living with his mother-in-law was his own."[3] If that was not the case, then the doctor had no opinion. The district attorney then pointed out to the court that there was no evidence in the record that defendant had been told any such thing. Defense counsel agreed[4] and withdrew the question.

---

[3]Defendant's wife, the mother of Ronald, had had an illegitimate child some years before Ronald's death.

[4]The only place in the record where anything of the kind appears is a statement in an interview between Doctor Jacobi and defendant during which defendant was under the influence of sodium amytal: " '. . . A. See she got my child from the first time. She never told me about that until I was arrested. Q. Uh-huh. That she got your child? A. I never thought about it too much. She must have been out, catting around. But if she had my first child and didn't tell me nothing about it when we got married, then she must not have cared very much about me or the baby or the marriage. . . .'' During the same interview defendant, apparently talking about his admissions said: "I told them I did it. I could not live with myself the rest of my life knowing——''

Nothing further was said about the admissibility of defendant's statements. It is obvious that when the defense did not get the answer from Doctor Jacobi which it evidently expected, any objection it had to the admission of defendant's statements was withdrawn. The motion to strike was never made. (*Schwartz* v. *Shapiro,* 229 Cal.App.2d 238, 247 [40 Cal.Rptr. 189].)

In any event, even if the court had expressly ruled that the statements were admissible, we could find no error. While *People* v. *Lara,* 67 Cal.2d 365, 378-391 [62 Cal.Rptr. 586, 432 P.2d 202] deals with minors rather than persons who are mentally handicapped, the "totality of circumstances" test is applicable to both situations. *In re Bunker,* 252 Cal.App.2d 297, 306 [60 Cal.Rptr. 344] is directly in point. We quote: "Although resting on a different legal theory, the contention that defendant had not intelligently waived his right to remain silent is based on the same arguments as we have just set forth in connection with the claim that the confession was involuntary. It is urged that the capacity to understand *Dorado* [62 Cal.2d 338 (42 Cal.Rptr. 169, 398 P.2d 361)] type warnings and capacity to make an intelligent waiver of *Dorado* rights involves the same mental process as does the capacity to participate in tactical and stratetic [*sic*] decisions during the trial and that a defendant incompetent to stand trial is, *a fortiori,* incompetent to waive constitutional rights.

"The argument is persuasive and it was presented to the trial court with skill and vigor by defendant's trial counsel. But the court had before it the testimony of the police officers, who had regarded defendant as understanding his rights, and a block of psychiatric reports based on a series of examinations, including the reports before the court in the section 1368 proceeding. The trial court, after considering all the data presented to it, and after argument, ruled that the confessions were admissible. In addition, the question of voluntariness and the question of waiver of the right to remain silent were both presented to the trial jury under instructions not here questioned. The issue was one of fact; neither the trial court nor the jury was necessarily bound to find that defendant was incompetent on October 13th to such an extent that he could not understand the *Dorado* warning and intelligently elect to disregard it or to such an extent that he could not give an accurate account of

the two crimes involved. We have no power to overturn the factual determination thus made."[5] (*Ibid.*, pp. 306-307.)

The judgment is affirmed.

Hufstedler, J., and Stephens, J., concurred.

[5]In the case at bar in view of the lack of a proper objection, the trial court was never called upon to make a factual determination. It is difficult to see, however; what basis there would have been in any of the testimony to support a ruling that a month after the murder defendant was not capable of understanding and waiving his constitutional rights.