[Nos. C061723, C063589. Third Dist. Jan. 19, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
CAREY LEWAN GRAM, Defendant and Appellant.

**1130**

COUNSEL

Julia J. Spikes, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French, Elizabeth A. Linton and Robert C. Nash, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

**BLEASE, J.**—This case tenders an issue concerning the appropriate procedure for challenging the administrative placement of a mentally disordered offender (MDO) who is recommitted to a facility under the jurisdiction of the Department of Corrections and Rehabilitation (CDCR) rather than to Napa State Hospital. We shall conclude that the appropriate procedure for testing the administrative placement of an MDO is a writ of habeas corpus.

Defendant Carey Lewan Gram, an MDO and involuntary civil committee, appeals from orders recommitting him to California State Prison, Sacramento (CSP-Sacramento) until January 6, 2010.[1] (Pen. Code, § 2972, subd. (c).)[2] He does not challenge the sufficiency of the evidence supporting the court's finding that he meets the definition of an MDO, or the court's conclusion that he must be recommitted. Rather, he contends his continued placement in a facility under the jurisdiction of CDCR violates his statutory right to treatment in the least restrictive environment possible given the nature of his symptoms (Welf. & Inst. Code, § 5325.1, subds. (a), (c)) and his federal constitutional right to substantive due process (U.S. Const., 14th Amend.). He also challenges the constitutionality of the statute authorizing his transfer in the first instance from Napa State Hospital to CSP-Sacramento. (Welf. & Inst. Code, § 7301.)

In ordering that Gram continue to be confined at CSP-Sacramento, the trial court specified that Gram be housed in the "less restrictive" enhanced outpatient/general population unit. While Gram's appeal of that order was pending, the trial court reconsidered its earlier ruling and ordered that Gram be housed in the more restrictive psychiatric services unit (PSU). Defendant

---

[1] Gram initially appealed from a March 5, 2009, order extending his involuntary mental health commitment. We later granted his motion to construe the appeal as including an April 16, 2009, decision concerning his placement.

[2] Further unspecified section references are to the Penal Code.

separately appeals that order, contending the trial court violated his right to substantive due process in ordering that he be housed in the PSU. We consolidated the two appeals on our own motion for purposes of oral argument and decision only.

In a request for supplemental letter briefs we directed the parties to inform us which administrative department(s) has the authority to determine the facility in which Gram should be housed, the policies and procedures applicable to such a determination, the procedure for challenging such a determination, and the policies and procedures governing a challenge.

Having reviewed the parties' briefs and the records in both cases, we shall conclude that the trial court was statutorily compelled to order that Gram be recommitted to CSP-Sacramento once it determined he met the definition of an MDO (§ 2972, subd. (c)). Accordingly, we shall find that Gram's constitutional challenge to Welfare and Institutions Code section 7301 is not cognizable on appeal.

We also shall conclude that the decisions whether to place Gram in the PSU or the enhanced outpatient/general population unit and whether to return him to Napa State Hospital are within the jurisdiction of the State Department of Mental Health and CDCR, *not* the trial court. To the extent Gram seeks to challenge such determinations, he must do so in a petition for habeas corpus. (Welf. & Inst. Code, § 7250.)

Accordingly, we shall affirm the March 5 and April 16, 2009, orders recommitting Gram to CSP-Sacramento until January 6, 2010, and vacate the November 6, 2009, order directing that he be housed in the PSU.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1994, during a persecutory delusion, Gram assaulted an elderly neighbor with a wooden club, striking her in the arm and stomach. As a result, in 1995, he was convicted of assault with a deadly weapon (§ 245, subd. (a)(1)) and sentenced to four years in state prison. In late 1997 or early 1998, he was paroled to Atascadero State Hospital (Atascadero) as an MDO. (§ 2962.) He later was transferred to Napa State Hospital for administrative reasons.

In July 2000, prior to the termination of his parole,[3] the district attorney filed a petition for continued involuntary treatment of Gram. (§ 2970.) The petition was granted, and Gram's commitment was extended to January 6,

---

[3] Gram's parole terminated on January 6, 2001.

2002. His commitment subsequently was extended in one-year increments through January 6, 2010. (§ 2972.)

On March 7, 2006, Gram was transferred to Napa County Jail and charged with making terrorist threats. (§ 422.) On March 22, 2006, he was transferred to CSP-Sacramento pursuant to Welfare and Institutions Code section 7301 because he purportedly "present[ed] an unacceptable risk to others at Napa State Hospital" and "the Department of Mental Health and Department of Corrections agree[d] that [he] require[d] treatment under custodial conditions."

In July 2008, the district attorney filed a petition to extend Gram's involuntary mental health commitment until January 6, 2010. (§ 2972.) Gram waived his right to a jury trial, and the matter was tried to the court on March 5, 2009. (§ 2972, subd. (a).)

At trial, the parties' respective experts agreed that Gram met the definition of an MDO, i.e., he had a serious mental disorder (schizoaffective disorder, bipolar type) that was not in remission and could not be kept in remission without treatment, and by reason of his disorder he represented a substantial danger of physical harm to others. (§ 2972, subd. (c).) As the People acknowledged in their trial brief, the main issue at trial was whether Gram should remain at CSP-Sacramento or be returned to Napa State Hospital.

The following evidence was adduced at trial. Gram was transferred to CSP-Sacramento after threatening hospital staff and peers at Napa State Hospital. More particularly, in September 2005, he accused a peer of stealing his cup and went after him with a chair, stating, "I will murder your fucking ass." Later that month, he had a verbal altercation with a peer and threatened to kill him. In October 2005, he was involved in a physical altercation with a peer. In December 2005, he reportedly "strong-arm[ed]" peers for money and cigarettes. In March 2006, he told one doctor, "I'll take you down physically and will fuck you if I go to prison," and another, "You mother fuckers should pray that they don't send me to prison because I'm—if not I'm going to fuck you up." He also told a peer, "I'll fuck you up [the] ass hole if you touch me." At some undisclosed time during his commitment at Napa State Hospital, he "knocked someone unconscious and sent them [sic] to the hospital . . . ." In the months leading up to his transfer to CSP-Sacramento, he was on one-on-one and then two-on-one observation "to prevent him from assaulting others."

Dr. Alvin Gaerlan, a clinical psychologist and Gram's case manager at CSP-Sacramento, testified for the People. At the time of trial, Gram had been housed in the PSU for nearly three years. The PSU houses mentally ill inmates with disciplinary problems. It "is like a jail within a prison." When inmates (or patients such as Gram) are moved outside their cells, they are "cuffed up" and escorted by two officers. Gram's treatment consisted of weekly one-on-one meetings with Gaerlan; group therapy two hours a day, five days a week; and at least monthly meetings with a psychiatrist. Every six months, treatment teams from Napa State Hospital and CDCR conferred and evaluated Gram's placement at CSP-Sacramento. The teams agreed that Gram must meet the following criteria to return to Napa State Hospital: (1) refrain from strong-arming or intimidating others for one year; (2) be free of physical assaults and verbal threats for one year; and (3) refrain from engaging in inappropriate sexual behavior for one year.

Following Gram's transfer to CSP-Sacramento, there were reports of him engaging in inappropriate sexual behavior and being verbally abusive.[4] At the time of the trial on March 5, 2009, however, Gram had been compliant with the criteria set for his return to Napa State Hospital for over a year. He had not acted violently, engaged in sexually inappropriate behavior, or threatened or strong-armed his peers. In addition, he had not received a rules violation and had been medication compliant. Gaerlan described Gram's behavior over the past year as "remarkable."

Nevertheless, Gram's treatment teams determined that he should remain at CSP-Sacramento and "transition" from the PSU to the enhanced outpatient program/general population unit, where he would have more opportunities to practice what he had learned. Gaerlan explained that Gram had not had an opportunity to physically harm, intimidate, or strong-arm anyone while housed in the PSU.

Dr. Gregory Sokolov, a psychiatrist and the medical director of psychiatric services at the Sacramento County jail, testified for Gram. Sokolov worked at Napa State Hospital from 2001 to 2003 and has been to the PSU at CSP-Sacramento. Sokolov opined that Gram could be more effectively

---

[4] In July 2006, he masturbated in front of a female guard; in December 2006, he masturbated in front of mental health personnel; and in August 2007, he masturbated while having his hearing tested. In July 2008, he told Gaerlan "I have no time to play games with you. I don't give a fuck. I want to go back to my cell. You're not helping me go home." In November 2008, he requested a new case manager, and in December 2008, he was verbally abusive.

treated at Napa State Hospital. According to Sokolov, the treatment provided in the PSU was not as comprehensive as that provided at Napa State Hospital. He explained that the group therapy at the PSU is sometimes conducted in "giant birdcages," which physically separate the patients from each other and from the therapist, making it difficult to develop a "therapeutic relationship." He also stated that "cell side" therapy generally is ineffective.

At trial, Gram argued that his continued confinement at CSP-Sacramento was unconstitutional and asked the court for an opportunity to brief the issue. The court granted his request. Meanwhile, the trial court found that he met the definition of an MDO and granted the petition to extend his commitment to January 6, 2010.[5]

On April 16, 2009, the court heard arguments concerning Gram's placement. Gram argued that his "continued placement within any facility under the jurisdiction of [CDCR] . . . is a violation of the Fourteenth Amendment and tantamount to punishment." Because he had met the criteria established by his treatment teams for his return to Napa State Hospital, he asserted that the least restrictive placement for him under the law was Napa State Hospital. The court rejected Gram's argument and ordered that he continue to be confined at CSP-Sacramento, "but in a less restrictive environment there, as Dr. Gaerlan was indicating that he was ready to do." On April 22, 2009, Gram timely appealed.

On May 15, 2009, the Attorney General, on behalf of CDCR, not a party to the action, moved to vacate the trial court's April 16, 2009, order to the extent that it ordered that Gram be housed in a less restrictive environment. CDCR argued that it was up to its departmental review board, not the court, "to determine whether a less restrictive setting is appropriate for [Gram] at this time."

On June 15, 2009, the People filed a motion for reconsideration of the court's April 16, 2009, order, requesting the court order that Gram be housed in the PSU. The basis of the motion was a May 30, 2009, incident during which Gram was reported to have "called over a psychiatric technician to get her attention while he was 'stroking his unexposed genital area.' " The People argued that because "this is the type of behavior, along with threatening behavior toward staff at Napa State Hospital, that led to [Gram] being placed at CSP-Sacramento in the first instance, it does not appear that [Gram] is actually ready for a less restrictive environment."

---

[5] A petition to extend Gram's commitment to January 6, 2009, was filed in August 2007; however, it was heard at the same time as the petition seeking to extend Gram's commitment until January 6, 2010. The delay in hearing the petition apparently was due to issues concerning Gram's competency. The trial court granted the petition to extend Gram's commitment to January 6, 2009, nunc pro tunc.

The motions were heard on November 6, 2009. The court granted the motion for reconsideration and ordered that Gram be housed in the PSU. Thereafter, it turned to the issue of its "authority to place Mr. Gram in any setting without the consent and recommendation of the Departmental Review Board." The court found that because its order that Gram be housed in the PSU was consistent with the departmental review board's initial placement decision, it need not address the issue of its authority.

In response to our request for supplemental letter briefs, the People requested we take judicial notice of a memorandum of understanding between CDCR and the State Department of Mental Health, State Department of Mental Health special order No. 608, and Napa State Hospital administrative directive No. 799. Each of those documents sets forth the policies and procedures governing the transfer of patients from the State Department of Mental Health to CDCR pursuant to Welfare and Institutions Code section 7301 and their return. (Evid. Code, §§ 450, 452, subd. (c), 453, 459.) We grant the request and take judicial notice of those documents as "[o]fficial acts of the legislative, executive, and judicial departments" of the state. (Evid. Code, § 452, subd. (c).) According to these documents, upon referral of a patient to CDCR, the State Department of Mental Health provides CDCR with "[a] statement listing the provisional criteria necessary for the patient to meet in order to be considered for transfer from CDCR back to [the State Department of Mental Health]." "CDCR clinical and custody staff at the institution where the patient is held and [State Department of Mental Health] staff from the referring state hospital . . . conduct ongoing treatment and custody reviews of inmate/patients transferred pursuant to [Welfare and Institutions Code] section 7301." Joint conferences are held every six months "to review treatment, progress, custody issues and discharge criteria." Patients are notified of the results of these evaluations and a copy is placed in the patient's treatment file. "If the decision is to return the patient to a state hospital the Director of Mental Health shall be notified. The CDCR Director's Review Board shall review the request to return the patient to [the State Department of Mental Health] within 30 days of the recommendation, and shall notify the Director of [that department] within (1) working day of approval. The Director of [the State Department of Mental Health] shall designate the state hospital to which the patient is to be transferred within five (5) working days of notification . . . ."

## DISCUSSION

The Legislature enacted the Mentally Disordered Offenders Act (Act) (§ 2960 et seq.) in 1985 to protect the public from and to provide treatment for prisoners with dangerous, treatable, severe mental disorders. (*People v. Allen* (2007) 42 Cal.4th 91, 97 [64 Cal.Rptr.3d 124, 164 P.3d 557]; see also

§ 2960.) Under the Act, a prisoner adjudicated to be an MDO may be civilly committed during and after parole if certain conditions are met. (42 Cal.4th at p. 94; §§ 2962, 2966, 2970, 2972.)

"As a condition of parole, a prisoner may be designated and civilly committed as an MDO for involuntary treatment of a 'severe mental disorder' if certain conditions are met." (*People v. Allen, supra,* 42 Cal.4th at p. 99, fn. omitted; see also § 2962.) A prisoner is subject to the Act if (a) the prisoner has a severe mental disorder that is not in remission, or cannot be kept in remission without treatment; (b) the severe mental disorder was a cause or aggravating factor in the crime for which the prisoner was sentenced; (c) the prisoner has been in treatment for the disorder for at least 90 days within the year prior to release on parole; (d) the prisoner represents a substantial danger of physical harm to others because of the severe mental disorder; and (e) the prisoner received a determinate sentence for the crime referenced in section 2962, subdivision (b), and the crime is among those enumerated in section 2962, subdivision (e). (§ 2962, subds. (a)–(e).)

■ Before the prisoner's termination of parole or release, the district attorney may petition to extend the commitment by one year. (§ 2970.) Thereafter, the district attorney may petition to extend that commitment in one-year increments. (§ 2972, subd. (e).) Section 2972 sets forth the procedures to be followed with regard to such petitions. A hearing on the petition is held before the trial court or a jury, and the person's MDO status must be proved beyond a reasonable doubt. (§ 2972, subd. (a).) If the trier of fact finds that the person is subject to continued involuntary treatment, i.e., he or she has a severe mental disorder that is not in remission or cannot be kept in remission without treatment, and, by reason of the disorder, represents a substantial danger of physical harm to others, "the court shall order the patient recommitted to the facility in which the patient was confined at the time the petition was filed, or recommitted to the outpatient program in which he or she was being treated at the time the petition was filed, or committed to the State Department of Mental Health if the person was in prison." (§ 2972, subd. (c).) If the court finds that there is reasonable cause to believe that the committed person can be safely and effectively treated on an outpatient basis, the "person shall be released on outpatient status . . . ." (§ 2972, subd. (d).)

In addition, pursuant to Welfare and Institutions Code section 7301, "[w]henever, in the opinion of the Director of Mental Health and with the approval of the [Secretary] of [the Department of Corrections and Rehabilitation],[6] any person who has been committed to a state hospital

---

[6] The "Department of Corrections" is now referred to as the "Department of Corrections and Rehabilitation," and the "Director" of that agency is now referred to as "Secretary." (§§ 5000, 5050.)

pursuant to provisions of the Penal Code . . . needs care and treatment under conditions of custodial security which can be better provided within the [Department of Corrections and Rehabilitation], such person may be transferred for such purposes from an institution under the jurisdiction of the State Department of Mental Health to an institution under the jurisdiction of [CDCR]."

I

### The Trial Court Was Statutorily Compelled to Order That Gram Be Recommitted to CSP-Sacramento, the Facility in Which He Was Confined at the Time the Petition Was Filed

Gram contends the trial court erred in ordering him recommitted to CSP-Sacramento. He asserts that "[a]fter a year of non-violence and medication compliance, [he] should have been sent back to Napa State Hospital."

The parties and the trial court assumed that the trial court had the discretion to order that Gram be returned to Napa State Hospital or another facility under the jurisdiction of the State Department of Mental Health. As we shall explain, it did not. Having determined that Gram was an MDO, the trial court was required under section 2972, subdivision (c), to order him recommitted to CSP-Sacramento, the facility in which he was confined at the time the petition was filed.

When a petition has been filed for continued commitment and the court or jury finds that a committee has a severe mental disorder not in remission that represents a substantial danger of physical harm to others the court is directed ("shall") to "order [an MDO] patient recommitted to the facility in which the patient was confined at the time the petition was filed, or recommitted to the outpatient program in which he or she was being treated at the time the petition was filed, or committed to the State Department of Mental Health if the person was in prison." (§ 2972, subd. (c).)

Section 2972 governs the conduct of hearings on petitions for continued treatment under section 2970. (§ 2972, subd. (a).) Section 2970 provides in pertinent part that "[n]ot later than 180 days prior to the termination of parole, *or release from prison if the prisoner refused to agree to treatment as a condition of parole as required by Section 2962*, . . . if the prisoner's severe mental disorder is not in remission or cannot be kept in remission without treatment, [the statutorily designated individual] . . . shall submit to the

district attorney of the county in which the parolee is receiving outpatient treatment, or for those *in prison* or in a state mental hospital, the district attorney of the county of commitment, his or her written evaluation on remission. . . . [¶] The district attorney may then file a petition with the superior court for continued involuntary treatment for one year." (Italics added.)

When read in conjunction with section 2970, it is clear that the phrase "in prison," as used in section 2972, refers to those prisoners who refuse to be treated by the State Department of Mental Health as a condition of parole and thus remain in prison. Gram was not "in prison" because he refused treatment as a condition of his parole, but rather, was transferred there pursuant to Welfare and Institutions Code section 7301. Accordingly, he was not "in prison" as contemplated in section 2972. Therefore, the trial court was statutorily required to order him recommitted to CSP-Sacramento. It was without jurisdiction to order him returned to Napa or any other facility under the jurisdiction of the State Department of Mental Health.[7]

Our conclusion is bolstered by the absence of any criteria in the statute to guide the court in making placement decisions. Elsewhere in section 2972, when the court is vested with the discretion to make other determinations— such as whether someone is an MDO (*id.*, subd. (c)) or when to release a patient on outpatient status (*id.*, subd. (d))—there are criteria to use in making such determinations.[8]

Our conclusion also is consistent with Welfare and Institutions Code section 7301, which vests the *Director of Mental Health* and the *Secretary of CDCR* with discretion to transfer an MDO from a facility under the jurisdiction of the State Department of Mental Health to a facility under the jurisdiction of CDCR when the MDO "needs care and treatment under

---

[7] Pursuant to section 2972, subdivision (d), if the court finds that there is reasonable cause to believe that the committed person can be safely and effectively treated on an outpatient basis, the "person shall be released on outpatient status . . . ." (§ 2972, subd. (d).) This subdivision is inapplicable here because neither party asserted and no evidence was introduced that Gram could be safely and effectively treated on an outpatient basis.

[8] Section 2972, subdivision (c) provides in pertinent part: "*If the court or jury finds that the patient has a severe mental disorder, that the patient's severe mental disorder is not in remission or cannot be kept in remission without treatment, and that by reason of his or her severe mental disorder, the patient represents a substantial danger of physical harm to others,* the court shall order the patient recommitted to the facility in which the patient was confined at the time the petition was filed, or recommitted to the outpatient program in which he or she was being treated at the time the petition was filed, or committed to the State Department of Mental Health if the person was in prison." (Italics added.) Subdivision (d) of section 2972 provides in pertinent part: "A person shall be released on outpatient status *if the committing court finds that there is reasonable cause to believe that the committed person can be safely and effectively treated on an outpatient basis.*" (Italics added.)

conditions of custodial security which can be better provided within [CDCR] . . . ." Judicial approval is not required.

For the reasons set forth above, we conclude that the decision of whether to transfer Gram back to Napa or another facility under the jurisdiction of the State Department of Mental Health is to be made by the Director of Mental Health in conjunction with the Secretary of CDCR.

II

Gram's Constitutional Challenge to Welfare and Institutions
Code Section 7301 Is Not Cognizable on Appeal

Gram contends Welfare and Institutions Code section 7301 is unconstitutionally vague because it fails to specify (1) "who has the burden to prove that the transfer is necessary and by what standard that burden has to be shown" or (2) "what conduct will give the directors cause to transfer a patient to prison."

Since the trial court was compelled to recommit Gram to CSP-Sacramento pursuant to subdivision (c) of section 2972, he cannot challenge the constitutionality of Welfare and Institutions Code section 7301 that sent him there in the first place. However, because this issue is likely to arise in the trial court in a habeas corpus proceeding, we observe that Gram has not tendered a colorable claim of unconstitutionality.

■ "It is a well-settled principle of constitutional law that 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' [Citation.] The policies underlying the proscription against vagueness are equally well established: 'Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.' [Citations.]" (*Cranston v. City of Richmond* (1985) 40 Cal.3d 755, 763 [221 Cal.Rptr. 779, 710 P.2d 845].)

" 'Civil as well as criminal statutes must be sufficiently clear as to give a fair warning of the conduct prohibited, and they must provide a standard or

guide against which conduct can be uniformly judged by courts and administrative agencies.' [Citation.] However, ' "[r]easonable certainty is all that is required. A statute will not be held void for uncertainty if any reasonable and practical construction can be given its language." [Citation.] . . . ' [Citation.] Moreover, courts have a duty to ' "construe enactments to give specific content to terms that might otherwise be unconstitutionally vague." ' [Citation.] 'If feasible within bounds set by their words and purpose, statutes should be construed to preserve their constitutionality.' " (*Money v. Krall* (1982) 128 Cal.App.3d 378, 394 [180 Cal.Rptr. 376].) With these principles in mind, we address Gram's assertions concerning the clarity of Welfare and Institutions Code section 7301.

■ Gram first asserts that the statute "fails to specify who [in an action challenging a transfer to a facility under the jurisdiction of CDCR] has the burden to prove that the transfer is necessary and by what standard that burden has to be shown." Not so. The decision to transfer a person committed to a state mental hospital to an institution under the jurisdiction of CDCR is within the discretion of the Director of Mental Health. (Welf. & Inst. Code, § 7301.) Thus, in an action challenging such a decision, the party bringing the challenge bears the burden of showing the director abused his or her discretion, i.e., that the decision was arbitrary, capricious, or in conflict with governing law. (See, e.g., *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 825–826 [135 Cal.Rptr.2d 1, 69 P.3d 927].)[9] Accordingly, Gram's assertion that the statute is unconstitutionally vague because it fails to specify who has the burden of proof and by what standard that burden has to be shown fails.

■ Gram next asserts that "[t]he statute forces a patient into a prison setting with no standards or guidelines or clue as to when it might be the opinion of the two directors that a transfer to prison is needed." Again, he is mistaken. Under the statute, transfer is authorized where, in the opinion of the Director of Mental Health and with the approval of the Secretary of CDCR, a person "needs care and treatment *under conditions of custodial security which can be better provided within the* [Department of Corrections and Rehabilitation] . . . ." (Welf. & Inst. Code, § 7301, italics added.) The Director of Mental Health, in consultation with the Secretary of CDCR, normally will be able to determine when a person requires "care and treatment under conditions of custodial security which can be better provided within [CDCR] . . . ." (See *Cranston v. City of Richmond, supra,* 40 Cal.3d at p. 769 ["Police officers, like teachers and veterinarians, will normally be able to determine what kind of conduct indicates unfitness . . . ."].)

---

[9] As discussed below, where such a decision is challenged on substantive due process grounds, certain burdens are placed on the People. (*Post,* at pp. 1142–1143.)

Accordingly, Gram has not tendered a colorable claim that Welfare and Institutions Code section 7301 is void for vagueness.[10]

### III

### Gram's Claims That His Continued Confinement at CSP-Sacramento Violates His Statutory and Constitutional Rights Must Be Raised in a Petition for Habeas Corpus

Gram contends that his continued confinement at CSP-Sacramento after a year of compliance with the criteria set for his return to Napa State Hospital (inter alia, nonviolence) violated his statutory and federal constitutional rights. As we shall explain, Gram has made out a colorable claim that his continued confinement at CSP-Sacramento violates his Fourteenth Amendment rights; nevertheless, he must pursue such a claim in a petition for habeas corpus. (Welf. & Inst. Code, § 7250.)

■ An MDO has "a right to care and treatment, within the limits permitted by the nature of the security risk which he presents . . . ." (*In re Cathey* (1961) 55 Cal.2d 679, 694 [12 Cal.Rptr. 762, 361 P.2d 426], disapproved on other grounds in *In re Barnett* (2003) 31 Cal.4th 466, 477, fn. 8 [3 Cal.Rptr.3d 108, 73 P.3d 1106].) More particularly, a person committed pursuant to section 2972 has a statutory right "to treatment services which promote the potential of the person to function independently. Treatment should be provided in ways that are least restrictive of the personal liberty of the individual." (Welf & Inst. Code, § 5325.1, subd. (a); see Pen. Code, § 2972, subd. (g).) The person also has the right "to be free from harm, including unnecessary or excessive physical restraint, isolation, medication, abuse, or neglect." (Welf. & Inst. Code, § 5325.1, subd. (c); see Pen. Code, § 2972, subd. (g).)

■ "The mere fact that [an individual] has been committed under proper procedures does not deprive him of all substantive liberty interests under the

---

[10] Nor has Gram tendered a colorable claim that Welfare and Institutions Code section 7301 violates the prohibition against double jeopardy. As just discussed, Welfare and Institutions Code section 7301 does not allow unfettered and unregulated transfer of civil committees to prison, as Gram asserts. As detailed below, an MDO who is transferred or recommitted to a facility under the jurisdiction of CDCR retains his or her right to substantive due process under the Fourteenth Amendment to the United States Constitution, which, among other things, prohibits an MDO from being confined under conditions that amount to punishment. (*Post,* at pp. 1142–1143.)

Fourteenth Amendment."[11] (*Youngberg v. Romeo* (1982) 457 U.S. 307, 315 [73 L.Ed.2d 28, 36, 102 S.Ct. 2452] (*Youngberg*).) Persons who are involuntarily committed have a constitutionally protected liberty interest in safety and freedom from restraint and may not be confined under conditions that constitute punishment. (*Id.* at pp. 318, 322 [73 L.Ed.2d at pp. 38, 41]; *Bell v. Wolfish* (1979) 441 U.S. 520, 535 [60 L.Ed.2d 447, 466, 99 S.Ct. 1861] (*Bell*); *Jones v. Blanas* (9th Cir. 2004) 393 F.3d 918, 932 (*Jones*).) However, "restrictions on liberty that [are] reasonably related to legitimate government objectives and not tantamount to punishment" will be upheld. (*Youngberg, supra*, 457 U.S. at p. 320 [73 L.Ed.2d at p. 40].)

Punitive conditions may be shown "(1) where the challenged restrictions are expressly intended to punish, or (2) where the challenged restrictions serve an alternative, non-punitive purpose but are nonetheless 'excessive in relation to the alternative purpose,' [citation], or 'are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods.' " (*Jones, supra*, 393 F.3d at p. 932; see also *Bell, supra*, 441 U.S. at p. 538 [60 L.Ed.2d at p. 468]; *Demery v. Arpaio* (9th Cir. 2004) 378 F.3d 1020, 1028.)

▪ The government has a legitimate interest in maintaining security and order at detention facilities. (*Bell, supra*, 441 U.S. at p. 540 [60 L.Ed.2d at p. 469].) Restraints that are reasonably related to that interest do not, without more, constitute unconstitutional punishment. (*Id.* at p. 539 [60 L.Ed.2d at p. 468].) "Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment . . . ." (*Ibid.*)

Thus, the salient question is whether a patient's continued confinement in prison is reasonably related to a legitimate governmental objective, and if so, whether it appears excessive in relation to that objective. (*Bell, supra*, 441 U.S. at p. 538 [60 L.Ed.2d at p. 468]; *Jones, supra*, 393 F.3d. at p. 932.)

Here, there is no evidence Gram physically assaulted or verbally threatened anyone since being transferred to CSP-Sacramento. That he assaulted people and threatened staff at Napa State Hospital in or before March 2006 does not provide a basis for continuing Gram's confinement at CSP-Sacramento in March 2009. Moreover, there is no indication in the record as to why, given

---

[11] The Fourteenth Amendment provides in pertinent part that no "State [shall] deprive any person of life, liberty, or property, without due process of law . . . ." (U.S. Const., 14th Amend., § 1.)

Gram's conceded "remarkable" performance over the past year, his "transition" to a less restrictive environment could not be accomplished in a facility under the jurisdiction of the State Department of Mental Health. While Gram reportedly engaged in sexually inappropriate behavior after the court ordered that he be recommitted to CSP-Sacramento until January 6, 2010, there is no evidence that his conduct threatened anyone's safety. While Dr. Gaerlan testified that Gram did not have the opportunity to *physically* harm, intimidate, or strong-arm anyone while housed in the PSU, Gram did have the opportunity to *verbally* threaten staff and other inmates during meetings and therapy sessions, but did not do so for over a year. That the conditions of Gram's confinement precluded him from physically harming others in and of itself does not justify his continued confinement. If that were the case, he would never be released as he would be unable to demonstrate compliance with the conditions set for his release by his treatment teams, and thus, could be confined indefinitely. In sum, on the facts tendered here, Gram has made a colorable claim that his continued confinement at CSP-Sacramento was excessive in relation to the stated objective—to deal with assaultive and sexually inappropriate behavior. Of course, other events may have since occurred that would alter that view.

Nevertheless, Gram must pursue his claim in a petition for habeas corpus. As previously discussed, the trial court lacked jurisdiction to order that Gram be returned to Napa State Hospital or another facility under the jurisdiction of the State Department of Mental Health. (*Ante*, at p. 1142.) That authority is vested in the State Department of Mental Health and CDCR (*ibid.*), and any challenge related to Gram's administrative placement must be raised in a petition for habeas corpus.

Welfare and Institutions Code section 7250 states in pertinent part: "Any person who has been committed is entitled to a writ of habeas corpus, upon a proper application made by the State Department of Mental Health or the State Department of Developmental Services, by that person, or by a relative or friend in his or her behalf to the judge of the superior court of the county in which the hospital is located . . . . Upon the return of the writ, the truth of the allegations under which he or she was committed shall be inquired into and determined. The medical history of the person as it appears in the clinical records shall be given in evidence, and the superintendent in charge of the state hospital wherein the person is held in custody and any other person who has knowledge of the facts shall be sworn and shall testify relative to the mental condition of the person." To the extent Gram wishes to challenge his continued confinement at CSP-Sacramento on grounds other than his status as an MDO, he must do so in a petition for habeas corpus.

## DISPOSITION

The March 5 and April 16, 2009, orders recommitting Gram to CSP-Sacramento until January 6, 2010, are affirmed, and the November 6, 2009, order directing that Gram be housed in the PSU is vacated.

Raye, P. J., and Nicholson, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 18, 2012, S200451. Cantil-Sakauye, C. J., did not participate therein.